STATE OF NORTH CAROLINA v. RONNIE WESLEY STROUD AND BONNIE EDWARDS STROUD

No. COA00-1153

(Filed 18 December 2001)

## 1. Constitutional Law— effective assistance of counsel— direct appeal—premature

A claim for ineffective assistance of counsel was prematurely asserted on direct appeal where defendant's arguments concerned potential questions of trial strategy and counsel's impressions and ineffective assistance of counsel could not be found on the face of the record. The procedure to determine those issues would be an evidentiary hearing through a motion for appropriate relief; defendant's direct appeal of this issue was dismissed without prejudice to his right to file that motion.

## 2. Homicide— first-degree murder—short-form indictment— sufficient

A short-form indictment was sufficient to charge defendant with first-degree murder.

**STATE v. STROUD**

[147 N.C. App. 549 (2001)]

### 3. Conspiracy— criminal—husband and wife—common law merger of identity—not applicable

The trial court did not err in the prosecution of a mother and stepfather for the murder of her child by denying the mother's motion to dismiss an indictment for conspiracy to commit murder on the grounds that a husband and wife are one entity under the common law and therefore cannot enter into a conspiracy with one another. Antiquated notions of a woman's identity found in the common law do not extend into an interpretation of the present-day crime of criminal conspiracy between husband and wife.

### 4. Appeal and Error— preservation of issues—composition of jury panel—no objection at trial

A first-degree murder defendant did not preserve for appellate review a challenge to the jury panel where she did not object at trial. A defendant must satisfy the requirements of N.C.G.S. § 15A—1211(c) to challenge the composition of a jury panel.

### 5. Jury— selection—divided pool—no plain error

There was no plain error in a first-degree murder prosecution where the pool of eighty-nine potential jurors was divided into multiple sequestered panels, with defendant Edwards present for the division of the last two groups and for the entire voir dire questioning. Defendant knew the procedure in advance, observed at least part of the procedure, expressly consented to the procedure afterwards, and did not use all of her peremptory challenges. She merely speculates that the State may have unfairly completed background checks on potential jurors when she was not present, but offers no evidence.

Judge JOHN concurring in part and dissenting in part.

Appeal by defendants from judgments entered 10 February 2000 by Judge Michael E. Helms in Superior Court, Wilkes County. Heard in the Court of Appeals 22 August 2001.

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell; and Special Deputy Attorney General James C. Gulick, for the State.*

STATE v. STROUD

[147 N.C. App. 549 (2001)]

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant Ronnie Wesley Stroud.*

*Don Willey for defendant-appellant Bonnie Edwards Stroud.*

McGEE, Judge.

Defendant Ronnie Wesley Stroud (Stroud) was indicted for conspiracy to commit murder and for the 6 July 1998 first degree murder of Darren Edwards. Defendant Bonnie Edwards Stroud, now known as Bonnie Edwards (Edwards), was also indicted for conspiracy to commit murder and for the first degree murder of Darren Edwards. The cases were joined for trial. A jury found both defendants guilty of first degree murder and conspiracy to commit murder on 10 February 2000. Both defendants were sentenced to life imprisonment without parole for the first degree murder convictions, and both defendants were sentenced to 189 to 236 months in prison for the conspiracy to commit murder convictions. Defendants appeal.

Evidence presented by the State at trial tended to show that eighteen-year-old Darren Edwards (Darren) was stabbed at his home in Wilkes County during the early morning hours of 6 July 1998. Darren lived with Edwards, his mother, and with Stroud, his stepfather. Dr. Patrick Lantz, who performed an autopsy of Darren's body on 7 July 1998, testified Darren died of a stab wound about two and a quarter inches long between his spine and his right shoulder blade. A knife went into Darren's right lung and severed his breathing tube.

A neighbor of Stroud and Edwards, Raye Miller, testified that on 6 July 1998, Edwards came to her house asking her for help and to call "911." Ms. Miller saw Darren lying in her front yard with puddles of blood around him. She testified Stroud stated, "I'll be sent off forever." Another neighbor, Colbert Eller (Eller), testified Stroud had awakened him by ringing his doorbell. He looked out his door and saw a body in Ms. Miller's yard and heard someone say, "I think he's dead."

Deputy Eric Anderson of the Wilkes County Sheriff's Department testified that when he arrived at the scene, he asked Stroud what had happened and Stroud replied, "Oh, my God, I did it. I did it. He hit Bonnie." Sergeant Alan Flora of the Wilkes County Sheriff's Department approached Stroud and asked if he needed help. Stroud

stated, "I threw it and I hit him with it, and now he's hurt bad." When Sergeant Flora asked what he threw, Stroud stated, "A knife."

Upon hearing Sergeant Flora confirm Darren was dead, Edwards became hysterical. As Sergeant Flora walked Edwards to her home, he observed blood across the driveway and a trail of blood towards the home of Edwards and Stroud. There was a significant amount of blood inside the home, especially in the kitchen. Edwards told Sergeant Flora, "I begged him not to bring that knife into this house." After unsuccessfully looking for the knife, officers asked Stroud for assistance, and he led them to where he had hidden the knife. Stroud kept saying, "I did it. I killed Darren."

Eller testified that about a week prior to Darren's death, he observed a fight between Darren and Stroud, in which Stroud was holding a baseball bat, and Darren was holding a piece of wood. Darren threw a rock at Stroud, and Stroud lost his footing. Darren took the bat from Stroud, and Stroud ran away with Darren chasing after him.

Darren's older brother, Bobby Edwards (Bobby), testified that the earlier death of his and Darren's father bothered Darren a great deal, and both Darren and Bobby were concerned about their mother dating Stroud soon after their father's death. Bobby testified that when he was at his mother's home, he saw problems between Darren, Edwards, and Stroud. Darren told Bobby about fights between Darren and Stroud, including one incident when Stroud allegedly hit Darren with a baseball bat.

Darren's fiancé, Angela Edgle, testified she observed a fight between Darren and Edwards about three weeks before Darren's death. Edwards chased Darren with a large piece of glass and told Darren to pack his things and leave the house.

Two social workers from the Wilkes County Department of Social Services testified there had been reports of violence at Darren's home involving Darren, Edwards, and Stroud. Their records indicated Darren was placed in the Ebenezer Garden Christian Children's Home in Wilkes County for a period of time because his mother's home was unsafe due to Stroud's presence. Edwards had agreed Darren needed to be out of her home because it was unsafe, but later she denied their problems after she learned she would not receive Darren's social security checks if he was not living in her home.

Several of Edwards' former co-workers at Tyson's Foods testified regarding statements Edwards had made in the past that she hated Darren, wished he were dead, and wished she had never had children. One co-worker testified Edwards told her if someone did not kill Darren, she would. Another co-worker testified that a couple of months before Darren's death, Edwards had asked her where Edwards might obtain a gun to kill Darren and Stroud. A benefits counselor at Tyson's Foods testified Edwards had several life insurance policies through her employment, including policies which covered her husband and any children under the age of nineteen, including Darren. In the event Darren died before age nineteen, Edwards would receive $50,000. Darren's nineteenth birthday would have been 24 July 1998.

Sandra Osborne (Osborne) testified that on the morning of 5 July 1998, Edwards went to the mobile home park where Stroud was staying with a friend. Osborne saw Edwards leave the trailer with a hunting knife about twelve to fourteen inches long. Osborne testified Edwards told her, "I smell death tonight." Edwards told Stroud to "get the knife and come on," and "this is going to end once and for all."

Neither defendant presented evidence at the guilt/innocence phase of the trial.

### I. Defendant Ronnie Wesley Stroud

### A.

[1] Stroud first argues he must be granted a new trial because he was not afforded effective assistance of counsel. He specifically argues his counsel failed to move to sever his case from Edwards' case for trial, failed to object to irrelevant evidence and inadmissible hearsay, and failed to request limiting instructions for evidence admissible against Edwards but not against Stroud.

In general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal. *See State v. Dockery*, 78 N.C. App. 190, 192, 336 S.E.2d 719, 721 (1985) ("The accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal."); *State v. Ware*, 125 N.C. App. 695, 697, 482 S.E.2d 14, 16 (1997) (dismissing defendant's appeal because issues could not be determined from the record on appeal and stating that to "properly advance these arguments defendant must move for appropriate relief

pursuant to G.S. 15A-1415."). A motion for appropriate relief is preferable to direct appeal because in order to

> defend against ineffective assistance of counsel allegations, the State must rely on information provided by defendant to trial counsel, as well as defendant's thoughts, concerns, and demeanor. "[O]nly when all aspects of the relationship are explored can it be determined whether counsel was reasonably likely to render effective assistance." Thus, superior courts should assess the allegations in light of all the circumstances known to counsel at the time of representation.

*State v. Buckner*, 351 N.C. 401, 412, 527 S.E.2d 307, 314 (2000) (citations omitted).

However, Stroud states that in light of *McCarver v. Lee*, 221 F.3d 583 (4th Cir. 2000), *cert. denied*, 531 U.S. 1089, 148 L. Ed. 2d 694 (2001), he has raised the issue of ineffective assistance of counsel on direct appeal. In *McCarver*, the Fourth Circuit Court of Appeals dismissed the defendant's petition for writ of habeas corpus, filed after the defendant's motion for appropriate relief had been denied, because the court stated the defendant's claim was barred by N.C. Gen. Stat. § 15A-1419(a)(3). This statute provides for denial of a motion for appropriate relief if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(3) (1999). In *State v. Fair*, 354 N.C. 131, 557 S.E.2d 500 (2001), our Supreme Court, agreeing with the analysis set out in *McCarver*, stated that " 'N.C.G.S. § 15A-1419 is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review. Instead, the rule requires North Carolina *courts* to determine whether the particular claim at issue could have been brought on direct review.' " *Fair* at 166, 557 S.E.2d at 525 (quoting *McCarver*, 221 F.3d 583 (4th Cir. 2000)). Our Supreme Court has instructed that "should the reviewing court determine the IAC claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's rights to reassert them during a subsequent MAR proceeding." *Fair* at 167, 557 S.E.2d at 525. In order to determine whether a defendant is in a position to adequately raise an ineffective assistance of counsel claim, we stress this Court is limited to reviewing this assignment of error only on the record before us, without the benefit of "information provided by defendant to trial counsel, as well as defendant's thoughts, concerns, and demeanor[,]" *Buckner* at 412, 527 S.E.2d at 314, that could be pro-

vided in a full evidentiary hearing on a motion for appropriate relief. Nonetheless, Stroud argues this case is one of those rare cases where ineffective assistance of counsel is shown on the face of the record on appeal.

In order to prevail on an ineffective assistance of counsel claim, a defendant must satisfy a two-prong test. "First, he must show that counsel's performance fell below an objective standard of reasonableness. Second, . . . he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error." *State v. Blakeney*, 352 N.C. 287, 307-08, 531 S.E.2d 799, 814-15 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984) and *State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985)). Furthermore, in determining an objective standard of reasonableness in the first prong of the test, the U.S. Supreme Court has stated that because

> of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland* at 689, 80 L. Ed. 2d at 694-95 (citations omitted). In the case before us, Stroud is unable, on the face of the record, to meet either of the prongs set out in *Strickland* and adopted by our Supreme Court in *Braswell*.

Stroud first argues his trial counsel did not object to substantial amounts of evidence he claims was admissible against Edwards but not against him, nor did his trial counsel request limiting instructions as to that evidence. However, it is not clear from the record whether the trial court would have granted Stroud's defense counsel's repeated requests to exclude evidence. Consequently, Stroud's counsel, as a tactical measure, may have refrained from continuous objections to evidence in order to avoid alienating the jury. Furthermore, if Stroud's counsel had requested a limiting instruction for the evidence Stroud contends was admissible against Edwards but not against him, Stroud's counsel possibly would have called more attention to the evidence than it warranted.

Stroud next argues his counsel provided ineffective assistance of counsel by not moving to sever his case from Edwards' for trial. However, from the record, this Court is unable to determine if this omission was ineffective, or again a tactical decision. There are drawbacks to any defendants' cases being joined for trial—any evidence admissible against one but not the other will still be heard by the jury, albeit with a limiting instruction. Nonetheless, in the case before us, anticipating much of the evidence might be admissible on other grounds, counsel for Stroud could have reasonably determined that Stroud's position juxtaposed against Edwards' position was advantageous. In any event, we cannot conclusively resolve this issue from the record. Stroud, at this point, has "prematurely asserted" his ineffective assistance of counsel claim and is "not in a position to adequately develop [his IAC claim] on direct appeal." *Fair* at 167, 557 S.E.2d at 525. As both of Stroud's arguments concern potential questions of trial strategy and counsel's impressions, an evidentiary hearing available through a motion for appropriate relief is the procedure to conclusively determine these issues.

As this Court is unable to find ineffective assistance of counsel on the face of the record, we dismiss this assignment of error without prejudice to defendant's right to file a motion for appropriate relief.

B.

[2] Stroud next argues the trial court erred by entering judgment on the first degree murder conviction and sentencing Stroud to life imprisonment without parole where the indictment was insufficient to charge first degree murder. A valid indictment must allege all of the elements of the crime sought to be charged. *Jones v. United States,* 526 U.S. 227, 143 L. Ed. 2d 311 (1999); *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435 (2000). Stroud argues the "short form" murder indictment alleges only the elements of second degree murder; the indictment does not contain the elements of premeditation and deliberation. Therefore, Stroud argues that the indictment was insufficient to charge him with first degree murder.

However, these short form indictments are authorized under N.C. Gen. Stat. § 15-144 (1999) and have been upheld by our Supreme Court after its consideration of *Jones* and *Apprendi* in *State v. Wallace,* 351 N.C. 481, 528 S.E.2d 326, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), and *State v. Braxton,* 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied,* 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Our

Supreme Court "has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions[,]" and "the short-form indictment is sufficient to charge first-degree murder on the basis of any of the theories, including premeditation and deliberation, set forth in N.C.G.S. § 14-17, which is referenced on the short-form indictment." *Braxton*, at 174, 531 S.E.2d at 437. Therefore, we overrule this assignment of error.

## II. Defendant Bonnie Edwards Stroud

### A.

**[3]** Edwards first argues the trial court erred in denying her motion to dismiss the indictment for conspiracy to commit murder on the grounds that under North Carolina common law a husband and wife are deemed to be one entity, and therefore, they cannot enter into a conspiracy with one another.

Edwards first relies on the principle that a "conspiracy is the unlawful concurrence of two or more persons in a wicked scheme— the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means." *State v. Goldberg*, 261 N.C. 181, 202, 134 S.E.2d 334, 348, *cert. denied*, 377 U.S. 978, 12 L. Ed. 2d 747 (1964), *rev'd on other grounds by News and Observer v. State; Co. Of Wake v. State; Murphy v. State*, 312 N.C. 276, 322 S.E.2d 133 (1984). Furthermore, "if one person merely feigns acquiescence in the proposed criminal activity, no conspiracy exists between the two since *there is no mutual understanding or concert of wills.*" *State v. Hammette*, 58 N.C. App. 587, 589, 293 S.E.2d 824, 826 (1982) (emphasis added). The alleged conspiracy in *Hammette* involved an undercover police officer and the defendant. However, our Court held this conspiracy was not possible since the two "conspirators" did not have a mutual understanding or concert of wills.

In the case before us, Edwards combines this theory with the common law principle that a husband and wife are one entity. As a result, she argues a husband and wife could not have a "concert of wills" to establish a conspiracy. Edwards argues this common law principle has not been abolished either by our General Assembly or our Supreme Court.

Although the issue of a criminal conspiracy between a husband and wife was raised in *State v. Phillips*, 240 N.C. 516, 82 S.E.2d 762 (1954), our Supreme Court remanded the case on other grounds

before reaching "the question whether the statutes liberating the wife from her merged identity with the husband have abrogated the common law rule that one spouse cannot be guilty of conspiracy with the other spouse alone." *Id.* at 521, 82 S.E.2d at 765. *But see Combs v. Com.*, 520 S.E.2d 388 (Va. 1999) (upholding conspiracy conviction between husband and wife for conspiracy to sell their child); *People v. Watkins*, 393 N.Y.S.2d 283 (1977), *aff'd*, 406 N.Y.S.2d 343, *cert. denied*, 439 U.S. 984, 58 L. Ed. 2d 656 (1978) (allowing indictment of criminal conspiracy between husband and wife and holding spousal communication privilege does not apply where both spouses engaged together in criminal activity); *State v. Pittman*, 306 A.2d 500, 502 (N.J. 1973) ("It is completely unrealistic to uphold an anachronism which suggests that in this day and age a married couple is legally incapable of engaging or agreeing to engage in illegal enterprises and therefore do not engage in them."); *People v. Lockett*, 102 Cal. Rptr. 41 (1972); *People v. Martin*, 122 N.E.2d 245, (Il. 1954). In *Com. v. Lawson*, 309 A.2d 391 (Pa. 1973), a Pennsylvania court held a husband and wife can commit criminal conspiracy and concluded there

> is no reason to perpetuate the fiction that husband and wife are one person with one will in the eyes of the law. They are not. They are separate individuals. Each has a distinct personality and a will which is not destroyed by any process of spousal fusion. Each acts separately and should be separately responsible for their conduct. We have so recognized in other areas of the law. Women should not lose their identity—or their responsibility—when they become wives. The status of wife or husband should not relieve any person of one's obligation to obey the law.

*Id.* at 396. While North Carolina courts have not reached this specific issue of criminal conspiracy among a husband and wife, other jurisdictions have, and those jurisdictions have consistently concluded such a conspiracy can exist.

In *Burton v. Dixon*, 259 N.C. 473, 131 S.E.2d 27 (1963), our Supreme Court upheld an action against a husband and wife for civil conspiracy. The Court cited G.S. 52-10 and G.S. 52-15 as examples of laws where "a married woman may 'sue and be sued in the same manner and with the same consequences as if she were unmarried.' " *Burton* at 477, 131 S.E.2d at 31 (citations omitted). These statutes were later codified as N.C. Gen. Stat. § 52-4 (1999) and N.C. Gen. Stat. § 52-12 (1999), and both these statutes abrogate common law rules. N.C.G.S. § 52-4 provides that

[t]he earnings of a married person by virtue of any contract for his or her personal service, and any damages for personal injuries, or other tort sustained by either, can be recovered by such person suing alone, and such earnings or recovery shall be his or her sole and separate property.

The common law rule provided that a recovery of the wife in court was the property solely of the husband and, as a result, required the husband to be joined in any action where a wife sought recovery. *See Patterson v. Franklin*, 168 N.C. 75, 84 S.E. 18 (1915) (Clark, C.J. concurring). After the enactment of N.C.G.S. § 52-4, a married person can sue and obtain a recovery completely separate from his or her spouse.

N.C.G.S. § 52-12 states that "[n]o married person shall be liable for damages accruing from any tort committed by his or her spouse, or for any costs or fines incurred in any criminal proceeding against such spouse." The common law rule that a husband was responsible for the torts of his wife because "her legal existence was incorporated in that of her husband" was abrogated by the General Assembly. *Roberts v. Lisenbee*, 86 N.C. 136, 137 (1882).

N.C. Gen. Stat. § 52-5 (1999) provides that "[a] husband and wife have a cause of action against each other to recover damages sustained to their person or property as if they were unmarried." The "common law disability of the spouses to sue each other in tort actions has been completely removed in North Carolina[.]" *Foster v. Foster*, 264 N.C. 694, 696, 142 S.E.2d 638, 640 (1965). This disability was based on the common law theory where "the husband and wife were considered one,—the legal existence of the wife during coverture being merged in that of the husband, and they were not liable for torts committed by one against the other." *Scholtens v. Scholtens*, 230 N.C. 149, 150, 52 S.E.2d 350, 351 (1949) (citations omitted).

N.C. Gen. Stat. § 52-10 (1999) allows contracts between a husband and wife without restriction, other than being consistent with public policy. This statute also abrogated the common law rule that husband and wife were considered the same entity. While contracts between a husband and wife have always been recognized in equity, at "the common law the husband and wife were regarded as so entirely one as to be incapable of either contracting with, or suing one another." *George v. High*, 85 N.C. 99, 101 (1881). N.C.G.S. § 52-4, N.C.G.S. § 52-5, N.C.G.S. § 52-12, and N.C.G.S. § 52-10 are all "statutes

liberating the wife from her merged identity with the husband[.]" *Phillips* at 521, 82 S.E.2d at 765.

Moreover, the abrogation of the merged identity of husband and wife has clearly been followed in federal courts and is supported by strong public policy. The well-settled modern rule in federal courts is that criminal conspiracy can occur between a husband and wife. *See United States v. Dege*, 364 U.S. 51, 4 L. Ed. 2d 1563 (1960). In *Dege*, the Supreme Court stated that the

> claim that husband and wife are outside the scope of an enactment of Congress in 1948, making it an offense for two persons to conspire, must be given short shrift once we heed the admonition of this Court that "we free our minds from the notion that criminal statutes must be construed by some artificial and conventional rule," and therefore do not allow ourselves to be obfuscated by medieval views regarding the legal status of woman and the common law's reflection of them. Considering that legitimate business enterprises between husband and wife have long been commonplaces in our time, it would enthrone an unreality into a rule of law to suggest that man and wife are legally incapable of engaging in illicit enterprises and therefore, forsooth, do not engage in them.

*Id.* at 52, 4 L. Ed. 2d at 1564 (citations omitted). To hold that criminal conspiracy cannot exist between a husband and wife would require us "to disregard the vast changes in the status of woman—the extension of her rights and correlative duties—whereby a wife's legal submission to her husband has been wholly wiped out, not only in the English-speaking world generally but emphatically so in this country." *Id.* at 54, 4 L. Ed. 2d at 1565.

Edwards argues in her brief that our State's "common law doctrine that a husband and wife are one entity and therefore cannot enter into a conspiracy remains the law today; it has at no point been abolished by statute or by ruling of the North Carolina Supreme Court." However, we note there is no past or present statute in this State that mandates the non-existence of criminal conspiracy between a husband and wife and no case law that establishes that criminal conspiracy cannot exist between a husband and wife. In consideration of the General Assembly's history of abrogating the common law rule of a wife's merged identity with her husband in the enactment of various statutes; along with the holding and reasoning of other jurisdictions, including our United States Supreme Court, on

this issue; and with no North Carolina statute or case law prohibiting the existence of criminal conspiracy among spouses; and in consideration of modern sensibilities and views of the status of women, we hold that such antiquated notions of a woman's identity found in the common law do not extend into an interpretation of the present day crime of criminal conspiracy between a husband and wife. Therefore, a husband and wife can enter into a criminal conspiracy between themselves.

> "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

*Dege* at 53-54, 4 L. Ed. 2d at 1565 (quoting Holmes, Collected Legal Papers, 187 (1920), reprinting The Path of the Law, 10 Harv L Rev 457, 469 (1897)). Furthermore, as former Chief Justice Walter Clark of our Supreme Court stated in 1912:

> It is true that under the decisions of the courts made in a ruder age, not based upon any statute, but evolved by the judges out of their own consciousness, and termed by euphemism "the common law," a married woman could not recover her earnings, nor for damages to her person, nor for her sufferings, physical or mental, and that compensation for all these things belonged to her husband, upon Petruchio's theory that the wife is the chattel or property of her husband.
>
> . . .
>
> Even statutes have been held obsolete and unenforcible [sic] because of changed conditions and the long lapse of time. Certainly this ought to be true of decisions which rest upon no statute and which are now contrary to every sense of right and opposed to the spirit of our Constitution and of the age in which we live.
>
> . . .
>
> There are of course principles of the common law which are eternally just and which will survive throughout the ages. But this is not because they are found in a mass of error or were enunciated by judges in an ignorant age, but because they are right in them-

selves and are approved, not disapproved as much of the common law must be, by the intelligence of today.

As, however, common-law views as to the status of women still survive among a few and are still urged as law, it would not be amiss should the General Assembly make such enactment in this regard as that body may deem just and proper. Every age should have laws based upon its own intelligence and expressing its own ideas of right and wrong. Progress and betterment should not be denied us by the dead hand of the Past. The decisions of the courts should always be in accord with the spirit of the legislation of to-day [sic][.]

*Price v. Electric Co.*, 160 N.C. 450, 455-57, 76 S.E. 502, 504-05 (1912) (Clark, C.J., concurring in the result). Because we hold that a husband and wife are capable of a criminal conspiracy, a fundamental principle on which Edwards relies fails. Having found a criminal conspiracy can exist between a husband and wife, this Court need not address Edwards' further argument that the trial court erred in admitting certain evidence under the co-conspirator exceptions. We dismiss this assignment of error.

B.

**[4]** Edwards next argues the trial court erred both in failing to impanel jurors by a system of random selection which precluded advance knowledge of the identity of the next juror, and in performing part of the jury selection process of separating jurors outside the presence of Edwards and her counsel. Edwards contends this process violated the provisions of N.C. Gen. Stat. § 15A-1214 and entitles her to a new trial. We disagree.

Stroud's counsel filed a motion for individual juror *voir dire* and sequestration of jurors on 22 December 1999 and mailed copies of the motion to all parties involved. The motion was also served on Edwards' counsel. Stroud requested in his motion that the jury pool be divided up during *voir dire* because it "is extremely important in a case such as this for a juror to feel free to candidly and honestly express their perceptions, feelings, biases, and prejudices. It would be impossible for jurors to do this if questioned collectively in panels." Furthermore, Stroud's counsel argued the jurors would be able to "become educated" by answers given and would likely then answer the *voir dire* questions in a manner "so as to be excused from jury service." An order was entered on 11 January 2000 granting the jury

selection procedures requested by Stroud. The record does not show that Edwards objected to the jury selection procedures prior to trial.

N.C.G.S. § 15A-1214(a) provides:

> The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called.

In the case before us, the record shows the total number of people in the potential jury pool was eighty-nine. The trial court divided these jurors into four panels of twenty jurors and one remaining panel of nine jurors. The one panel of nine and three panels of twenty were removed from the courtroom and sequestered in other areas of the courthouse. Edwards was present for the division of the last two groups, and she was present for the entire *voir dire* questioning. At the end of the division into groups, counsel for Edwards stated, upon being questioned by the trial court, "Yes, sir. The Defendant Bonnie Stroud consents to the procedure *that we've agreed upon*." (emphasis added). Edwards knew the type of jury selection that had been requested and ordered. She observed a portion of the actual division of the jury panel into groups, and not only did she fail to object, but she expressly consented to a procedure her counsel stated she had previously agreed upon.

In general, when "a trial court acts contrary to a statutory mandate, the defendant's right to appeal is preserved despite the defendant's failure to object during trial." *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). However, in order to challenge the composition of a jury panel, a defendant must satisfy the requirements of N.C. Gen. Stat. § 15A-1211(c) (1999), which provides that a challenge

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

Edwards failed to follow the procedures set out in N.C.G.S. § 15A-1211(c). Therefore, in "light of defendant's failure to follow the procedures clearly set out for jury panel challenges and [her] failure

to alert the trial court to the challenged improprieties," Edwards has failed to preserve this issue for appeal. *Braxton*, 352 N.C. at 177, 531 S.E.2d at 439.

**[5]** Edwards further contends this process was performed outside her presence. Again, Edwards failed to object at trial, and we must therefore review this issue under a plain error standard. Edwards has failed to show any prejudice as a result of her not being present. Edwards merely speculates the State may have unfairly completed background checks on potential jurors; however, she offers no evidence of this behavior. Furthermore, Edwards failed to use all of her peremptory challenges and indicated she was satisfied with the jury chosen. A defendant "cannot demonstrate prejudice in the jury selection process if he does not exhaust his peremptory challenges." *State v. Hyde*, 352 N.C. 37, 53, 530 S.E.2d 281, 292 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). *See also* N.C. Gen. Stat. § 15A-1214(h) (1999). Edwards knew in advance what the procedure would be, she observed at least part of the proceedings at trial, and she expressly consented to the procedure afterwards. Edwards' argument that her consent is flawed since it was an after-the-fact consent to a proceeding she did not observe is without merit, in that Edwards admitted she had previously agreed to the system chosen. We overrule this assignment of error.

C.

Edwards argues the "short form" murder and conspiracy indictments violate her right to notice and right to due process under the United States and North Carolina Constitutions. This assignment of error is essentially the same as Stroud's second assignment of error. Accordingly, this Court adopts the same reasoning set out above in (I.)(B.). Therefore, we overrule this assignment of error.

D.

Edwards next argues the trial court erred in granting the State's motion to amend the indictment for conspiracy to add the language of "Now known as Bonnie Edwards" following defendant's name. However, Edwards conceded at oral argument the case law did not support her argument, and she abandoned this argument. Therefore, we dismiss this assignment of error.

No error in the trial of Ronnie Wesley Stroud.

No error in the trial of Bonnie Edwards Stroud.

Judge HUDSON concurs.

Judge JOHN concurs in part and dissents in part with a separate opinion.

JOHN, J., concurring in part, dissenting in part.

I concur in the majority opinion in all respects save that portion of section I.A. dismissing without prejudice defendant Ronnie Wesley Stroud's ineffective assistance of counsel claim. As to that issue, I do not read either *McCarver v. Lee*, 221 F.3d 583 (4th Cir. 2000), *cert denied*, 551 U.S. 1089, 148 L. Ed. 2d 694 (2001), or *State v. Fair*, 552 S.E.2d 568 (2001), as mandating that an ineffective assistance of counsel claim, raised on direct appeal in consequence of a defendant's calculated "decision," *id.* at 593, to do so, be reviewed by *both* the appellate and trial courts. Stroud elected to pursue such claim in this Court without an evidentiary hearing in the trial court, potentially available to him had he filed a motion for appropriate relief in that court, and thus has made the "decision" referred to in *Fair. Id.* at 593. Indeed, he asserts in his appellate brief that "this is a rare case in which specific instances of ineffective assistance of counsel may be found on the face of the record on appeal."

The majority properly considers Stroud's assertion on direct appeal of ineffective assistance of counsel in light of the instant record and concludes he is unable "to meet either of the prongs set out in *Strickland* and adopted by our Supreme Court in *Braswell*." I join the majority's determination that Stroud's ineffective assistance of counsel claim is without merit. *See Fair* at 594, ("defendant has failed to show that his attorney's conduct rose to the level of unreasonableness or that his attorney's conduct prejudiced defendant's trial," citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693 (1984), and, "defendant's ineffective assistance of counsel claims are thus without merit"). For the reasons stated herein, therefore, I respectfully dissent from the majority's dismissal without prejudice of defendant Ronnie Wesley Stroud's ineffective of assistance of counsel claim and vote no error thereon.