An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-589

Filed 18 June 2025

Mecklenburg County, Nos. 17CRS246281-590; 17CRS246282-590; 17CRS246362-590; 17CRS246363-590;17CRS246994-590; 17CRS246995-590; 17CRS246996-590; 17CRS246997-590; 18CRS201187-590; 18CRS201932-590; 18CRS201933-590

STATE OF NORTH CAROLINA

v.

ANGEL MARIO GUZMAN-LOBO

Appeal by Defendant from judgments entered 14 April 2023 by Judge Carla N. Archie in Mecklenburg County Superior Court. Heard in the Court of Appeals 19 March 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Megan Shook, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Nicholas C. Woomer-Deters, for the Defendant.*

WOOD, Judge.

Angel Mario Guzman-Lobo ("Defendant") was found guilty by jury verdict on four counts of statutory sex offense with a child and seven counts of taking indecent liberties with children. Prior to trial, Defendant moved to suppress statements from

his interview with law enforcement, where he admitted to inappropriately touching minor children. Defendant's motion was denied. The trial court's denial, and preservation of objection to the admission of his confession, is now the subject of this current appeal. For the foregoing reasons, we hold Defendant did not receive ineffective assistance of counsel for defense counsel's failure to preserve the suppression issue for appellate review. Defendant received a fair trial free from error.

## I. Factual and Procedural Background

In November 2017, Kayla[1] disclosed to her mother that Defendant had touched her vagina underneath her clothes on numerous occasions. Kayla's mother took her to her doctor for a physical examination, filed a statement concerning the disclosure, and had Kayla complete a forensic interview.

Detective Andrew Key ("Detective Key") and Officer Travis Archer ("Officer Archer") with the Charlotte-Mecklenburg Police Department went to Defendant's home on 14 December 2017 at approximately 9:00 a.m. Detective Key specifically requested Officer Archer, a Department certified Spanish translator, assist because Defendant mainly spoke Spanish. Officer Archer was in uniform while Detective Key was dressed in a shirt, tie, and police jacket, which covered his handcuffs and weapon.

The officers knocked on Defendant's front door. After no response, they went to a different door in the carport, knocked, and looked through a nearby window and

---

[1] A pseudonym is used to protect the identity of the juvenile pursuant to N.C. R. App. P. 42(b).

into a parked vehicle. Eventually, Defendant opened the door at the carport. He was wrapped in a towel and informed the officers that he needed to get dressed. As they waited, Officer Archer called a third officer, Officer Salazar, to the home to stand at the back door in case Defendant attempted to flee. Defendant returned to the door after approximately seven minutes.

Detective Key, using Officer Archer to translate, informed Defendant that they were at his home to investigate an incident involving a minor child, Kayla. Detective Key asked Defendant if he was willing to come to his office to discuss what happened between him and Kayla. Defendant agreed, and Detective Key emphasized that his compliance was voluntary. Defendant told Officer Archer that he could not drive the vehicle in the driveway, so the officers offered him a ride to the station. Before entering Officer Salazar's patrol car, Defendant was frisked and Detective Key again stated to Defendant, "this is voluntary, you are not under arrest."

Defendant arrived at the Law Enforcement Center around 10:00 a.m. and was placed in an interview room. Detective Key told Defendant that he had requested a Spanish interpreter from Choice Translating and was waiting for the translator to arrive before beginning the interview. The interview room door remained open per Department policy while Officer Salazar stood outside the room. While Defendant waited, he made two phone calls and was escorted once to the water fountain.

Around 10:53 a.m., Detective Key entered the interview room with a translator. Detective Key asked Defendant if he preferred the door open or closed

and Defendant did not indicate a preference. Detective Key then closed the door for privacy reasons. Detective Key, through the translator, began the interview by stating: "This is a voluntary interview"; "Did anyone make you come down here by force today"; "Did anybody force you in this room here today"; "If at any time you don't want to talk anymore, just let me know"; "We're recording this interview." Defendant indicated he understood and stated twice he was there voluntarily.

The interview lasted nearly three hours. Defendant explained that Kayla and her mother lived with his cousin, Paola. Paola has two daughters, Jennifer and Amanda,[2] who live in the home. Defendant stated that a few years prior, he had stayed at Paola's home for a few months. Defendant admitted that he had touched Kayla, Jennifer, and Amanda on their vaginas, both over and under their clothing. He further admitted that he had put his finger in Kayla's and Jennifer's vaginas "more than ten times." Defendant told Detective Key that he was "playing" with them and that the girls did not complain when he touched them. At the end of the interview, Defendant was arrested.

Subsequently, two other minor girls, Catherine and Irene,[3] disclosed that Defendant had touched them as well. Catherine and Irene disclosed that the touching had occurred while Defendant was visiting their homes. Kayla, Amanda, Jennifer, Catherine, and Irene reported multiple occurrences of some sort of vaginal touching

---

[2] *See* n.1.
[3] *See* n.1.

during a four-year time period, spanning November 2013 to December 2017. Throughout this time, all five girls were minors ranging in ages from four to ten years old.

On 29 July 2019 and 5 August 2019, Defendant was indicted on four counts of statutory offense with a child, for victims Kayla and Jennifer, and eight counts of indecent liberties with a child, for all five minor victims.[4]

Prior to trial on 24 March 2023, Defendant moved to suppress the entirety of his recorded interview with Detective Key, his confession within the interview, and his specific admissions to digital penetration. Defendant argued his statements during the interview were obtained in violation of his constitutional rights because he was not informed of his *Miranda* rights prior to questioning. On 3 April 2023, the trial court held a pre-trial hearing on Defendant's motions to suppress. At the hearing, the trial court considered evidence of testimony from Detective Key and Officer Archer; Officer Archer's body camera footage from their visit to Defendant's home; and Defendant's recorded interview with Detective Key.

The trial court denied Defendant's motions to suppress, concluding he "was not in custody and *Miranda* rights were not required and that his confession was freely

---

[4] Defendant was indicted on 18 December 2017 for two counts of statutory sex offense with a child, Kayla; on 8 January 2018 for four counts of indecent liberties with a child, Kayla and Amanda, and two counts of statutory sex offense with a child, Jennifer; and on 29 January 2019 for four counts of indecent liberties with a child, Catherine and Irene. By superseding indictments, Defendant was indicted on 29 July 2019 for all offenses regarding Kayla, and on 5 August 2019, he was indicted on the remaining charges as to victims Amanda, Jennifer, Catherine, and Irene.

and voluntarily made." In arriving at its conclusion, the trial court orally recited the following relevant findings:

> Officer Archer was dressed in his uniform, standard CMPD uniform with handcuffs in the back portion of his utility belt.
>
> He was called to assist because he was certified in speaking Spanish and needed to assist in communicating with the Defendant. . . .
>
> Detective Key was dressed in a shirt and tie with his police jacket, a gun on his left hip, cuffs on his right hip, both of which were covered by his jacket. . . .
>
> When the officers first arrived, the Defendant appeared at the door in a towel. He was given an opportunity to change into clothes and did so after several minutes.
>
> Detective Key asked the Defendant if he would be willing to go down to the police station voluntarily, and he was -- told the Defendant he was not under arrest. And the Defendant asked if there would be someone to interpret for him and he was told, yes.
>
> The Defendant walked to the patrol car. He was not handcuffed. He was frisked prior to being put in the patrol car. He entered the patrol car of his own volition again not handcuffed.
>
> At the Law Enforcement Center he was placed in an interview room. The door was left open.
>
> There was an approximate wait of one hour for a representative from Choice Translation to arrive.
>
> During the wait he was asked if he wanted anything and the Defendant said water.
>
> He was escorted to a nearby water fountain.

During the course of the wait the Defendant retained access to his cell phone and did in fact talk on his cell phone during the wait.

Once the interview began the interview room door was closed. The parties present in the interview room were the Defendant, Detective Key, and the translator.

The Defendant was again told that he was not being forced into an interview, that he was free to stop at any time, free to leave.

The interview lasted for approximately three hours, during which the Defendant was not restrained. He never asked to leave or stopped the interview or expressed any hunger, thirst, or desire to use the restroom.

The Court, based on its observation of the recorded interview, State's Exhibit M3, notes that the Defendant's demeanor appeared relaxed.

During the course of the interview Detective Key did not make any promises to the defendant. He did, however, on several occasions express that he didn't believe that the Defendant was telling him the whole truth or that the Defendant was not seeking gratification during his encounters with the prosecuting witnesses.

Defendant's trial was held from 3 April 2023 to 14 April 2023. At trial, the five victims testified. Kayla testified that Defendant would periodically stay overnight at her home. She recounted that on numerous occasions, Defendant would place her on his lap, put his hand under her pants, and touch her vagina with his fingers. She testified that Defendant never inserted his fingers inside her vagina, but instead, he would move his fingers around for about five minutes. On another occasion,

Defendant went into her bedroom, pulled her pants down, and placed his penis on her vagina without inserting it. Kayla testified that Defendant frequently threatened her, saying he would hurt or kill Kayla's mother if she disclosed what occurred.

Jennifer gave similar testimony. She testified that Defendant would sit next to her on the couch, put his hands under her clothing, and move his fingers in and out of her vagina. At other times, she would be lying on the couch, instead of being seated. She testified that Defendant attempted to touch her every time he came to visit. He told Jennifer, as long as she allowed him to touch her, he would not touch her little sister, Amanda.

Amanda testified that Defendant would put her on his lap and touch her "private part" both inside and outside of her underwear. She believed that this occurred every time Defendant visited. After he touched her, Defendant would give her candy and tell her not to tell anyone, as nobody would believe her. On one occasion, Amanda witnessed Defendant touching her sister Jennifer.

Catherine testified that Defendant once picked her up, spun her around, and touched her "private area" over her clothing. At the time, she did not realize what Defendant was doing. Irene testified that Defendant would stay overnight at her home on the weekend and go to church with her family on Sundays. When he visited, Defendant would block her from leaving the kitchen, pick her up, and touch her vagina over her clothing. She reported this occurred "[v]ery often" and Defendant told Irene not to tell her parents.

Along with the testimony from the victims, Detective Key testified about his interview with Defendant, including Defendant's admissions. The State admitted into evidence the video of Defendant's interview and the corresponding transcript.

Following the close of the State's evidence, the State dismissed one count of indecent liberties as to Catherine. Following deliberations on 13 and 14 April 2023, the jury found Defendant guilty on all remaining charges. The trial court consolidated the offenses for sentencing and sentenced Defendant to two consecutive active sentences of 300 to 420 months of imprisonment. Following sentencing, Defendant gave oral notice of appeal.

## II.    Analysis

On appeal, Defendant argues the trial court erred by denying the motion to suppress his confession. Defendant concedes, however, that the suppression issue was not properly preserved for appellate review. Defense counsel objected to the admission of the video and transcript of Defendant's confession. However, defense counsel did not object during Detective Key's testimony regarding all the admissions Defendant made during the interview. Accordingly, Defendant has failed to preserve this issue for our review.[5] *See State v. Waring*, 364 N.C. 443, 468, 701 S.E.2d 615, 631

---

[5] We note, Defendant does not contend in his brief that this issue amounts to plain error. In the absence of an argument under the plain error standard, we deem this issue abandoned. *See* N.C. R. App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is *specifically and*

(2010) ("A pretrial ruling on a motion to suppress evidence is preliminary. Because the evidence may be different when offered at trial, a party has the responsibility of making a contemporaneous objection.").

Acknowledging this preservation error, Defendant does not request plain error review; rather, he argues that he received ineffective assistance of counsel because his counsel failed to renew an objection during Detective Key's testimony. "In general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal." *State v. Stroud*, 147 N.C. App. 549, 553, 557 S.E.2d 544, 547 (2001).

However, this Court has held "ineffective assistance of counsel claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Campbell*, 359 N.C. 644, 691, 617 S.E.2d 1, 30 (2005) (quoting *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001)). If the ineffective assistance of counsel claim is determined to be prematurely brought, we must dismiss without prejudice to preserve "the defendant's right to reassert them during a subsequent [motion for appropriate relief] proceeding." *Id.* (quoting *Fair*,

---

*distinctly contended to amount to plain error.*") (emphasis added).

354 N.C. at 167, 557 S.E.2d at 525). Here, the record on appeal and transcript of the proceedings are sufficient and require no further investigation to decide Defendant's ineffective assistance of counsel claim on the merits on direct review. *See State v. Burton*, 251 N.C. App. 600, 604, 796 S.E.2d 65, 68-69 (2017).

To establish ineffective assistance of counsel, Defendant must satisfy a two-prong test. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985). Deficient performance can be demonstrated by a showing that "his counsel's conduct fell below an objective standard of reasonableness." *State v. Moore*, 286 N.C. App. 341, 344, 880 S.E.2d 710, 713 (2022). "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error were [sic] so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*" *Braswell*, 312 N.C. at 562, 324 S.E.2d at 248. In other words, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Covington*, 248 N.C. App. 698, 706, 788 S.E.2d 671, 677 (2016).

"If a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding

would have been different, then the court need not determine whether counsel's performance was actually deficient." *State v. Wilson-Angeles*, 251 N.C. App. 886, 895-96, 795 S.E.2d 657, 665 (2017). Thus, we first determine whether Defendant has established a reasonable probability that, absent defense counsel's errors, the result of the proceeding would have been different. To do so, we analyze whether the trial court properly denied Defendant's motion to suppress his confession. If the motion was properly denied, then, even if defense counsel objected during Detective Key's testimony and therefore preserved review of the trial court's denial of his motion to suppress his confession, Defendant cannot establish the result of the proceeding would have been different.

Defendant moved to suppress the entirety of his interview with Detective Key, or in the alternative, his statements regarding digital penetration, arguing the interview became increasingly custodial or involuntary and he should have been read his *Miranda* rights. He contends the interview, specifically Detective Key's statements during the interview, were coercive and resulted in an involuntary confession. We disagree. The trial court properly concluded that Defendant was not in custody, *Miranda* rights were not required, and Defendant's confession was freely and voluntarily made.

The Fifth Amendment provides an individual with "procedural safeguards" known as *Miranda* rights, which "bars statements resulting from [a] custodial interrogation from being used against a defendant." *State v. Davis*, 237 N.C. App. 22,

28, 763 S.E.2d 585, 589 (2014). For purposes of a custodial interrogation, a defendant must be "advised of the 'right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney [.]'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)).

"The test for whether a person is in custody for *Miranda* purposes is whether, under the facts and circumstances then existing, 'a reasonable person in the suspect's position would feel free to leave or compelled to stay.'" *State v. Deese*, 136 N.C. App. 413, 417, 524 S.E.2d 381, 384 (2000) (quoting *State v. McNeill*, 349 N.C. 634, 644, 509 S.E.2d 415, 421 (1998)). "Miranda warnings are not required simply because the questioning takes place in the police station or other 'coercive environment' or because the questioned person is one whom the police suspect of criminal activity." *Id.* Rather, "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Davis*, 237 N.C. App. at 28, 763 S.E.2d at 589. To assess whether an individual is "in custody," this Court has outlined the following considerations: "whether a suspect is told he or she is free to leave, whether the suspect is handcuffed, whether the suspect is in the presence of uniformed officers, and the nature of any security around the suspect." *Id.* at 28, 763 S.E.2d at 590. "The proper inquiry for determining whether a person is in custody for purposes of *Miranda* is based on the totality of the circumstances." *State v. Johnson*, 251 N.C. App. 639, 656, 795 S.E.2d 625, 636 (2017) (cleaned up).

Both before and at the start of Defendant's interview, Defendant was not "in

custody;" thus, *Miranda* warnings were not required. When Detective Key and Officer Archer spoke to Defendant at his house, Detective Key told Defendant that his willingness to speak with them and willingness to come to the Law Enforcement Center was voluntary. He was provided with transportation, as he did not have an available vehicle. Before entering the patrol car, Detective Key reiterated, "this is voluntary, you are not under arrest."

Upon arrival at the Law Enforcement Center, Defendant was placed in an interview room. He was informed that he would be waiting for an interpreter to arrive. The door to the interview room remained open at all times, and Officer Salazar stood outside per Department policy. Although Defendant waited approximately one hour for the interpreter to arrive, he made two phone calls and was escorted to the water fountain during that time. Detective Key testified that the Department's policy for an escort was based on safety considerations.

When the interview began, Defendant, Detective Key, and the interpreter were the only individuals present. Detective Key asked Defendant if he preferred the door open or closed and Defendant did not express a preference. When Detective Key closed the door for privacy reasons, Defendant did not express any concern. Significantly, Detective Key restated to Defendant: "[T]his is a voluntary interview;" "Did anyone make you come down here by force today;" "Did anybody force you in this room here today;" "If at any time you don't want to talk anymore, just let me know;" "[W]e're recording this interview." Defendant indicated he understood and stated

twice he was there voluntarily.

While Detective Key did not explicitly state to Defendant that he was "free to leave" at any time, he did state to Defendant that if he did not want to talk anymore, let him know. A reasonable person would conclude from these statements that he or she could leave at any point on their own accord. Similarly, Defendant was told numerous times that his participation in the interview was "voluntary." Further, Defendant was not handcuffed or in the presence of multiple uniformed officers, nor did Detective Key implement any security measures around Defendant. *Davis*, 237 N.C. App. at 28, 763 S.E.2d at 589.

Under the totality of the circumstances, we hold a reasonable person in Defendant's position would feel free to leave, not compelled to stay. *Deese*, 136 N.C. App. at 417, 524 S.E.2d at 384. Detective Key took appropriate measures to ensure that Defendant understood that the interview was voluntary, that he could stop talking at any time, and that his comfort level was considered, both before and at the start of the interview.

We now review whether the interview became coercive as it progressed.

This Court has previously addressed factors used to determine the voluntariness of a defendant's confession and whether the confession resulted from coercive or threatening behavior. This Court in *Cureton*, analyzed whether the evidence tended to show that the defendant was "verbally or physically threatened," whether "the officers used promises to induce a confession," if "the interrogation was

unduly long," and whether the defendant "was deprived of basic comforts and necessities." *State v. Cureton*, 223 N.C. App. 274, 287, 734 S.E.2d 572, 582 (2012). Likewise, this Court considered "whether defendant was in custody," "whether he was deceived," and "whether he was held incommunicado." *State v. Thompson*, 149 N.C. App. 276, 281, 560 S.E.2d 568, 572 (2002).

Here, Defendant argues his interview became coercive and directs this Court to the following statements Detective Key made:

> You're the first person that I have ever talk[ed] to that tells me that he puts his hand inside of a little girl's pants and underwear in a playful manner and thought that was normal.

> [Y]ou have no business and no right sticking your hand inside of a little girl's pants and underwear.

> So I think your fingers did go inside their vagina.

> [T]his is your chance to be completely honest with me and tell me what happened. Otherwise whatever these girls say I'm gonna believe 100%.

> [T]he ones who tell me, "I don't remember[,]" [a]re the ones I believe actually did it, because how do you not know?

Applying the same principles considered in *Cureton*, we find no indication of coercion. Defendant was not verbally or physically threatened, was not provided with a promise to induce a confession, and was not deprived of basic comforts and necessities. Neither was the three-hour interrogation unduly long. *Cureton*, 223 N.C. App. at 287, 734 S.E.2d at 582. Detective Key's interrogation techniques were not

coercive or deceptive. Defendant was not restrained, did not ask to leave, did not express he was hungry or thirsty, did not express he had to use the restroom, and his demeanor appeared relaxed. Contrary to his assertions, Defendant voluntarily admitted to sexually abusing Kayla, Jennifer, and Amanda.

In *State v. McKinney,* we held, "[t]he officers urged defendant to tell the truth but only if he had committed the crime. There is no evidence that the officers promised leniency or other relief from the criminal charge in exchange for defendant's confession. The admonitions of the officers do not bolster circumstances indicating coercion." *State v. McKinney*, 153 N.C. App. 369, 374, 570 S.E.2d 238, 243 (2002). There, the officer told the defendant that they did not believe him and encouraged him to tell the truth. The officers also stated that the defendant would benefit from showing remorse if he had committed the crimes. The statements made by Detective Key are similar to statements made by an officer in *McKinney*.

Here, Detective Key told Defendant he did not believe him and told him this was his opportunity to be honest. However, Detective Key stated this after informing Defendant that Kayla, Jennifer, and Amanda already told him what had occurred. When discussing digital penetration of Kayla and Jennifer, Detective Key told Defendant he did not believe what he was saying because "when [he] asked [Defendant] that question [Defendant] had to think really long and hard about it." Additionally, Detective Key asked Defendant how he could not remember doing such, stating, "It's your hand, it's your finger." As in *McKinney*, these statements,

specifically read in context, do not indicate coercion.

Based on the totality of the circumstances, we hold Defendant's interview did not turn coercive as it progressed over a three-hour time span. There was no evidence that Detective Key coerced Defendant to obtain a confession. The record supports the trial court's finding that Defendant's consent and participation in the interview was entirely voluntary.

Because Defendant was not in custody, a reading of his *Miranda* rights was not required. Detective Key did not interrogate Defendant in a coercive or deceptive manner; thus, Defendant's confession was freely and voluntarily made. The trial court did not err by denying Defendant's motion to suppress the interview in its entirety, or alternatively, Defendant's admissions concerning digital penetration.

As discussed *supra*, "if a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *Wilson-Angeles*, 251 N.C. App. at 895-96, 795 S.E.2d at 665. Because Defendant cannot satisfy the second prong to establish ineffective assistance of counsel, we deny his ineffective assistance of counsel claim.

### III.    Conclusion

For the foregoing reasons, the trial court did not err by denying Defendant's motion to suppress his interview and subsequent confession. After thorough review

of the record, we conclude that even if counsel's performance were found to be deficient for failure to object, absent counsel's errors, no reasonable probability exists that the result of the proceedings would have been different. Therefore, we deny Defendant's ineffective assistance of counsel claim.

NO ERROR IN PART; DENIED IN PART.

Judges ARROWOOD and FLOOD concur.

Report per Rule 30(e).