STATE v. CURETON

[223 N.C. App. 274 (2012)]

STATE OF NORTH CAROLINA v. KEITH LAMAR CURETON

No. COA12-147

(Filed 6 November 2012)

### 1. Confessions and Incriminating Statements—motion to suppress—Miranda rights—knowing and intelligent waiver

The trial court did not err in a resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, and felonious possession of a firearm by a felon case by denying defendant's motion to suppress the statements he made during a recorded interrogation at the police station even though defendant contended that he never waived his *Miranda* rights. Defendant knowingly and intelligently waived his *Miranda* rights based on his repeated assurances that he understood his rights and wanted to continue talking to the detectives.

### 2. Confessions and Incriminating Statements—motion to suppress—ambiguous request for counsel—failure to exercise right

The trial court did not err in a resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, and felonious possession of a firearm by a felon case by denying defendant's motion to suppress the statements he made during a recorded interrogation at the police station even though defendant contended that his request for counsel was ignored. Defendant never unambiguously requested to speak with counsel. Further, once defendant was informed that it was his decision whether to invoke the right to counsel, he opted not to exercise that right.

### 3. Confessions and Incriminating Statements—motion to suppress—voluntariness

The trial court did not err in a resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, and felonious possession of a firearm by a felon case by denying defendant's motion to suppress the statements he made during a recorded interrogation at the police station even though defendant contended that his confession was not voluntary. The totality of the circumstances supported the trial court's ruling that defendant's confession was voluntary.

**STATE v. CURETON**

[223 N.C. App. 274 (2012)]

**4. Constitutional Law—right to counsel—mental competency in gray-area—no higher competency standard for self-representation**

The trial court did not violate defendant's Sixth Amendment rights by denying him counsel at trial in a resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, and felonious possession of a firearm by a felon case even though defendant contended his mental competence placed him in the "gray-area." Although self-representation resulting from forfeiture is not the same concept as self-representation due to voluntary waiver, the Supreme Court has expressly refused to adopt a higher competency standard for self-representation in general.

**5. Constitutional Law—right to counsel—forfeiture—serious misconduct**

The trial court did not commit structural error in a resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, and felonious possession of a firearm by a felon case by ruling that defend-ant forfeited his right to counsel. Defendant committed serious misconduct that would justify a ruling that he forfeited his right to court-appointed counsel. Due to his own misconduct, it could not be determined if defendant was even in the "gray-area." Further, defendant's trial participation provided strong evidence that he was able to understand and focus on pertinent legal issues.

Appeal by defendant from judgments entered 16 June 2011 by Judge Eric L. Levinson in Mecklenburg County Superior Court. Heard in the Court of Appeals 16 August 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Jane Oliver, for the State.*

*Mary March Exum for defendant appellant.*

McCULLOUGH, Judge.

On 24 March 2011, a jury found Keith Lamar Cureton ("defendant") guilty of six charges: resisting a public officer, felonious breaking or entering, larceny after breaking or entering, felonious possession of a stolen firearm, felonious possession of a firearm by a felon, and also of being an habitual felon. On appeal, defendant contends the trial

court erred by: (1) admitting into evidence his statement made to police during a recorded interrogation at the police station, during which time he confessed to having possessed the weapons in question as well as to having committed various property crimes; (2) denying his Sixth Amendment right to counsel by forcing him to proceed *pro se* at his criminal trial; and (3) determining that defendant forfeited his right to court-appointed counsel. We hold defendant received a fair trial free of prejudicial error.

## I. Background

On 17 July 2009, at around 8:35 p.m., Mecklenburg County police officers Morton and Kodad stopped and questioned defendant after observing him standing in the middle of the street, failing to yield to traffic. Defendant appeared agitated and gave the officers a false name. Officer Kodad, suspecting defendant may be dangerous, approached defendant to place him in handcuffs. Before Officer Kodad could reach him, defendant fled on foot toward the breezeway at the Johnson and Wales college dorms. Both officers pursued defendant. At one point during the chase, Officer Kodad rounded a corner and saw defendant moving his hands toward the ground while hunched down at the bottom of a fence. Officer Kodad yelled at defendant to stop, but defendant turned and jumped the fence. The officers continued their pursuit of defendant, and eventually captured him at the base of a brick fence.

After defendant was detained, Officer Morton retraced the path where defendant had fled on foot. At the exact location where Officer Kodad had observed defendant hunched down toward the ground moving his hands, Officer Morton discovered two loaded, silver handguns. One of the handguns was a Highpoint .380 with altered serial numbers. The other handgun was a Lorcin .380 with a serial number identifying it as a handgun that had recently been reported stolen from a residence in Perth Court.

Defendant was subsequently arrested and transported to the Mecklenburg County Jail. On 20 July 2009, at 9:27 a.m., Detectives Grande and Simmons arrived at the Mecklenburg County Jail to question defendant about the handguns as well as defendant's suspected connection to a robbery in Perth Court. At the beginning of the interrogation, Detective Simmons read through the "Waiver of Rights" form, which defendant refused to sign. When asked whether he understood the rights that had been read to him, defendant indicated that he was somewhat confused. Defendant asked the detectives several questions about his rights, particularly about his right to counsel.

The detectives explained to defendant that it was his decision whether he wanted to speak to an attorney before answering any questions. Defendant never expressly requested the presence of an attorney. The detectives began interrogating defendant after he repeatedly indicated that he understood his rights and that he wanted to talk. Defendant ultimately confessed to having possessed both of the guns as well as to having committed three breaking or entering violations at Perth Court.

After being formally charged, defendant was appointed counsel on three separate occasions. Defendant's first court-appointed attorney, Gregory Tosi, met with defendant in February 2010. At their first meeting Tosi noticed that defendant appeared groggy and confused. Defendant claimed that he did not remember speaking with the police, nor did he understand why he was in jail. Concerned with defendant's capacity to stand trial, Tosi arranged to have defendant undergo psychological evaluations.

On 22 March 2010, Jennifer Kuehn, a certified forensic examiner, conducted an evaluation to determine whether defendant was capable of proceeding to trial. As a result of her examination, Kuehn concluded:

Mr. Cureton's inability to communicate, whether intentional or due to undetermined cognitive limitations rendered it impossible for this screening to establish his capacity to proceed. Based upon his presentation at the time of the interview, it is my opinion the defendant would not be able to assist his attorney and participate in a meaningful way in his defense at this time . . . ; his abnormally disengaged affect and communication demands deeper evaluation to discern if the cause is related to his medications, his mental health, or malingering.

Kuehn subsequently recommended that defendant undergo further evaluation at the Pre-trial Center at Central Regional Hospital in Raleigh to determine his capacity to proceed.

On 10 June 2010, defendant was admitted to the pretrial evaluation unit at Dorothea Dix Hospital, and remained there until 17 June 2010. While there, defendant was evaluated by forensic psychologist Charles Vance, M.D., Ph.D. Dr. Vance's evaluation consisted of a thorough review of defendant's past medical and mental health records, numerous interviews with defendant, and ongoing observations of defendant's behavior while at Dorothea Dix. Defendant was described as "behaviorally cooperative but electively mute," he "showed poor eye contact . . . mumbled . . . [and] at times made ges-

tures . . . to communicate his meaning." While Dr. Vance found defendant's behavior "unusual," he noted that defendant's "presentation . . . does not readily conform to the clinical pictures typically encountered for any known mental illness." In order to further clarify defendant's condition, Dr. Vance administered a modified version of the Competency Assessment for Standing Trial for Defendants with Mental Retardation test. Defendant provided incorrect answers to all but three of the twenty-six questions that he answered. Dr. Vance noted:

> As each question on this test had only two possible choices, it could be said that a person would have a 50% chance of guessing any item correctly . . . . [A]n individual who is completely incompetent . . . would still be expected to get approximately half of the items correct purely by guessing.

Dr. Vance believed there was "an overwhelming likelihood that [defendant] was . . . intentionally performing badly on this test . . . to make himself appear more impaired than was actually the case." At the end of the week-long evaluation period, Dr. Vance's final conclusion was that defendant "voluntarily and willfully" "presents himself as being too impaired to proceed to trial" and diagnosed defendant as "malingering." Dr. Vance further concluded, "based on his prior experiences with the legal system, and based on the mental health conditions he does and does not have" defendant was fully competent to stand trial.

On 30 June 2010, the Honorable Forrest D. Bridges entered an order finding defendant capable of proceeding to trial. Judge Bridges' ruling was based on Dr. Vance's forensic report, as well as defendant's demeanor while in court. Prior to the hearing on defendant's capacity to proceed, Defense Counsel Tosi met with defendant to report the results of Dr. Vance's evaluation. Once defendant was informed of Dr. Vance's diagnosis, his behavior towards Tosi was markedly different than it had been previously. Defendant became angry, aggressive, loud and threatening, and accused Tosi of not doing his job. Additionally, defendant refused to speak with Tosi about the evidence, charges, or possible defenses available. Tosi believed the relationship had deteriorated to the point where he could no longer effectively represent defendant, and he moved to withdraw as counsel. This motion was granted and defendant was appointed a second attorney, Christopher Sanders, on 7 July 2010.

Sanders met with defendant on three separate occasions. During the first two meetings, defendant was agitated and combative. Defendant refused to discuss the discovery with Sanders, and he spent the bulk of the second meeting complaining about the plea offer, which he believed was overly harsh. During the third meeting, defendant was extremely loud, combative and animated. Defendant was irrational, uncooperative and continuously shouted at Sanders. At one point, defendant threatened to kill Sanders and spat in his face. This incident caused Sanders to believe his life was in jeopardy, and he feared defendant would harm him if he had the opportunity. On 25 August 2010, Sanders told the Honorable Calvin E. Murphy, Superior Court Judge Presiding, that he wanted to withdraw as defendant's counsel on the grounds that he feared for his personal safety. Judge Murphy allowed Sanders to withdraw as counsel and subsequently advised defendant that he was willing to appoint new counsel to represent defendant, but if defendant's conduct induced this counsel to seek withdrawal, the court might not appoint another attorney to represent defendant.

On 30 August 2010, the court appointed Lawrence Hewitt as the third counsel to represent defendant. Initially, Hewitt and defendant had a cooperative and productive relationship. However, this relationship quickly deteriorated after defendant began mailing Hewitt angry, accusative letters. In one such letter, defendant accused Hewitt of lying to his aunt, and stated that he had turned Hewitt in to the North Carolina State Bar for lying. In another letter, defendant wrote, "Don't come with . . . I no longer need you. I will represent myself in court, you lying assed bastard." Despite these letters, Hewitt tried to meet with defendant on several occasions, but their relationship became increasingly strained. Defendant was frustrated with Hewitt's inability to negotiate a more lenient plea offer, and he accused Hewitt of conspiring with the District Attorney. Defendant became increasingly uncooperative and defendant would often hover above Hewitt and yell at him during their meetings. Hewitt eventually concluded he could no longer effectively represent defendant, and moved to withdraw as counsel.

On 13 December 2010, Judge Levinson held a hearing to determine whether defendant had forfeited his right to court-appointed counsel. After hearing the testimony of Tosi, Sanders and Hewitt, Judge Levinson ruled on 17 December 2010, that defendant had forfeited his right to court-appointed counsel.

On 28 January 2010, Judge Levinson held a status conference with defendant, *pro se*, and the District Attorney. During the conference, Judge Levinson addressed defendant and informed him that he faced the real prospect of an extremely lengthy period of incarceration. After reminding defendant that he had forfeited his right to court-appointed counsel, Judge Levinson expressed that he would nonetheless prefer it if defendant were represented by counsel. Judge Levinson told defendant that he would be willing to appoint another attorney if defendant would provide some sort of assurance that it would be meaningful, and that he would not engage in any misconduct that would cause the attorney to move to withdraw. Judge Levinson repeatedly asked defendant whether he wanted a lawyer, and defendant did not respond, even after Judge Levinson informed him that a simple thumbs up or thumbs down would suffice.

On 3 February 2011, Judge Levinson held a second conference with defendant, *pro se*, the District Attorney, and an attorney, Rick Beam. Having read the opinion in *State v. Wray*, 206 N.C. App. 354, 698 S.E.2d 137 (2010), Judge Levinson indicated that he was fully confident defendant had engaged in serious misconduct to support his earlier ruling that defendant had forfeited his right to counsel. Nonetheless, Judge Levinson wanted to provide defendant with another opportunity to request court-appointed counsel. Judge Levinson informed defendant that he had asked Attorney Rick Beam to meet with defendant to determine whether it would be useful for him to represent defendant, and whether defendant wanted Mr. Beam to represent him. Mr. Beam left the room to meet with defendant privately, but defendant refused to speak with him. Mr. Beam reentered the court and informed Judge Levinson that defendant was not interested in his representation. Judge Levinson noted on the record that there was significant evidence defendant knew what was going on and that he had communicated with others, including the court deputies while outside of the courtroom. Judge Levinson decided not to appoint standby counsel for defendant and declared, "even if I put aside the fact that he has forfeited his rights to counsel, he has not asserted his rights to counsel. To the contrary, I begged him and told him that I would provide counsel."

The trial began on 21 March 2011 and defendant was not represented by counsel. At first, defendant sat silently and refused to participate. However, as the trial went on, defendant began to conduct his own defense. Using gestures, defendant participated in jury selection. Additionally, during the first day of trial, defendant cross-

examined Officer Morton, and was able to establish that Morton found no guns on defendant when he patted him down.

On the second day of trial, just before the State called its second witness, defendant suddenly informed the court that he wanted an attorney, because he did not understand the legal terms that had been used throughout the course of the trial. The court declined defendant's request on the grounds that the court had ruled on 17 December 2010 that defendant had forfeited his right to court-appointed counsel, and defendant failed to avail himself of multiple opportunities to request counsel subsequent to that date. After denying defendant's sudden request for counsel, the trial continued and defendant once again participated in his own defense. Defendant questioned Marcella Hunter, the owner of the stolen handgun, as well as the State's DNA expert. Additionally, defendant presented evidence on his own behalf, and recalled Officers Morton and Kodad for direct examination. Finally, defendant delivered a closing argument to the jury in which he summarized the weaknesses in the State's evidence, and argued that these weaknesses gave rise to a reasonable doubt as to his guilt.

The jury found defendant guilty of all charges. Defendant was ultimately sentenced to two consecutive sentences of between 100 and 129 months' imprisonment. Defendant gave oral notice of appeal on 24 March 2011.

## II. Motion to Suppress

Defendant first contends that the trial court erred in denying his motion to suppress the statements he made during the recorded interrogation at the police station. Defendant specifically argues that his statements should be suppressed on the grounds that: (1) he never waived his *Miranda* rights, (2) his request for counsel was ignored, and (3) his confession was not voluntary. We find no error with the trial court's ruling.

When reviewing a trial court's denial of a motion to suppress, our review is strictly limited to determining whether competent evidence supports the trial court's underlying findings of fact, and whether those factual findings in turn support the trial court's legal conclusions. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "[T]he trial court's findings of fact after a *voir dire* hearing concerning the admissibility of a confession are conclusive and binding on the appellate courts if supported by competent evidence. This is true even though the evidence is conflicting." *State v. Simpson*, 314 N.C.

359, 368, 334 S.E.2d 53, 59 (1985) (citations omitted). However, the trial court's conclusions of law that a defendant's statements were knowingly, intelligently, and voluntarily made are fully reviewable on appeal. *Id.*; *see also State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000).

## A. Waiver of Miranda

**[1]** Defendant first argues that the trial court erred in denying his motion to suppress the statements he made during the police interrogation on the grounds that he never validly waived his *Miranda* rights, in particular, his right to counsel. Defendant argues that he never explicitly waived his *Miranda* rights, nor was he mentally competent to knowingly and intelligently do so. We disagree.

"The Fifth Amendment to the United States Constitution requires a criminal suspect to be informed of his rights prior to a custodial interrogation by law enforcement officers." *State v. Harris*, 111 N.C. App. 58, 65, 431 S.E.2d 792 (1993) (citing *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966)). These rights provide that he has the

> right to remain silent; that any statement may be introduced as evidence against him; that he has the right to have counsel present during questioning; and that, if he cannot afford an attorney, one will be appointed for him.

*Simpson*, 314 N.C. at 367, 334 S.E.2d at 58-59. "If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Davis v. United States*, 512 U.S. 452, 458, 129 L. Ed. 2d 362, 370 (1994).

Because the right to counsel is "sufficiently important to suspects in criminal investigations," the United States Supreme Court has afforded it "the special protection of the knowing and intelligent waiver standard." *Id.* (internal quotation marks and citation omitted). Under this standard, "[w]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege[.]" *Edwards v. Arizona*, 451 U.S. 477, 482, 68 L. Ed. 2d 378, 385 (1981). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Simpson*, 314 N.C. at 367, 334 S.E.2d at 59. The prosecution bears the heavy burden of showing that the waiver was knowingly, intelligently, and voluntarily made. *Id.* at 367, 334 S.E.2d at 58-59.

As evidence that defendant did not knowingly and intelligently waive his right to counsel, defendant first points out that he never signed the "Waiver of Rights" form that was presented to him during the interrogation. This evidence does little, if anything to indicate that defendant did not validly waive his rights. As was explained by the United States Supreme Court in *North Carolina v. Butler*, although "[a]n express written or oral statement of waiver . . . of the right to counsel is usually strong proof of the validity of that waiver," it is neither sufficient, nor necessary for establishing waiver. 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292 (1979).

Defendant next argues that he was incapable of knowingly and intelligently waiving his rights because his borderline mental capacity prevented him from fully understanding those rights. First, defendant emphasizes the fact that he has an IQ of 82 and a history of past mental illness. Although courts consider subnormal intelligence a relevant factor when determining the validity of a waiver, "[i]t is well established that . . . this condition standing alone will not render a confession inadmissible if it is in all other respects voluntarily and understandingly made." *Simpson*, 314 N.C. at 368, 334 S.E.2d at 59. Furthermore, it is important to note that a later psychological evaluation diagnosed defendant as "malingering" and found him fully competent to stand trial. Although this evaluation occurred subsequent to defendant's arrest, the North Carolina Supreme Court has found such evidence persuasive in determining whether a defendant was competent to knowingly and voluntarily waive his rights at the time of the interrogation. *See id.* at 369, 334 S.E.2d at 60. Thus, beyond establishing that defendant had subnormal intelligence or a past history of mental illness, there must be compelling evidence that these limitations actually prevented defendant from fully comprehending his rights.

As further evidence of his inability to understand his rights, defendant highlights specific excerpts from the interrogation where defendant indicated that he was confused about his rights. For instance, when asked whether he understood his rights, defendant responded, "I understand them but I don't fully understand them all the way." Additionally, defendant requested to call his aunt so that she could help him understand the "Waiver of Rights" form. Despite this evidence of confusion, a full review of the interrogation transcript supports the trial court's finding that defendant understood his rights, and that he knowingly and intelligently waived those rights.

Defendant's initial confusion is fully remedied by the detectives' subsequent conversations with defendant. The detectives repeatedly asked defendant to specifically describe what he did not understand about his rights. In response to defendant's inquiries, the detectives explained that it was his choice whether he wanted to speak with an attorney, and they also clarified that he did not have to sign the waiver form as long as he stated that he understood the form's contents. After answering defendant's questions, the detectives subsequently asked defendant numerous times whether he fully understood his rights, and whether he wanted to speak with them. Each time defendant answered in the affirmative. Despite these repeated assurances, Detective Grande gave defendant one more chance to ask further questions, or to change his mind before he began the interrogation. The conversation was as follows:

GRANDE:    But, I want to make sure that we're really clear . . . in fairness to you, I just want to make sure if you have any questions about those protections. I want to answer those for you now.

CURETON:   What's the protection?

GRANDE:    The rights that were explained. They just protect you . . . make sure you understand the rules of the game and how things need to be done. You understand exactly what was read?

CURETON:   Yeah.

GRANDE:    Okay. And you want to speak to us about the break-in, and we will talk about the warrants and anything else that we might ask you about?

CURETON:   Yeah[.]

In lieu of defendant's repeated assurances that he understood his rights and that he wanted to continue talking to the detectives, we hold that the trial court did not err in ruling that defendant knowingly and intelligently waived his *Miranda* rights.

B. Invocation of the Right to Counsel

[2] Beyond arguing that defendant never waived his right to counsel, defendant also contends that he actually invoked his right to counsel during the interrogation. Defendant argues that his statements should be suppressed because the interrogating officers ignored this request

for counsel. We disagree on the grounds that defendant never unambiguously requested to speak with counsel.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning[.]" *Davis*, 512 U.S. at 457, 129 L. Ed. 2d at 370. "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 358, 129 L. Ed. 2d at 370.

Courts apply an objective inquiry when determining whether the accused actually invoked his right to counsel. *Davis*, 512 U.S. at 459, 129 L. Ed. 2d at 371. In *Davis*, the United States Supreme Court described the standard for invocation as follows:

Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." . . . [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Id.* (citation omitted). In other words, in order for a defendant to effectively invoke the right to counsel, the request must be clear and unambiguous.

In the present case, defendant's argument that he invoked his right to counsel is based on a specific exchange between defendant and the detectives. After reading defendant his *Miranda* rights, Detective Simmons asked defendant if he understood what was just read to him. Defendant responded, "I understand them but I don't fully understand them all the way." Detective Grande asked defendant to explain what aspect of his rights he did not understand. Defendant replied:

"[R]ight to talk to a lawyer to have a lawyer here with me now to advise . . . help during the questioning. That is what I was saying . . . I asked you can I talk with my lawyer or do I need to wait for? That's why I asked you."

Detective Simmons responded:

"That's your decision. That's your decision. Now . . . people decide if they want to get . . . . If you don't want us to have your

side of their . . . if you decided that you . . . you . . . you want a lawyer, then we're . . . we're out of here. We're gone 'cause we can't get your side."

In response, rather than requesting the presence of an attorney, defendant prodded the detectives for more information about the case, asking, "What have we got going on so far?" Detective Simmons responded, "Well, I can't talk to you about that unless you say you're willing to talk." Rather than requesting an attorney, defendant indicated that he wanted to talk.

An objective analysis of defendant's statements reveals that they are, at best, ambiguous concerning whether or not defendant requested an attorney. "Although a suspect need not 'speak with the discrimination of an Oxford don,' . . . he must articulate his desire to have counsel present sufficiently clearly[.]" *Davis*, 512 U.S. at 459, 129 L. Ed. 2d at 371. Defendant never expressed a clear desire to speak with an attorney. Rather, he appears to have been seeking clarification regarding whether he had a right to speak with an attorney before answering any of the detective's questions. There is a distinct difference between inquiring whether one has the right to counsel and actually requesting counsel. Once defendant was informed that it was his decision whether to invoke the right to counsel, he opted not to exercise that right.

### C. Voluntary Confession

[3] Defendant finally contends that his statements during the interrogation should be suppressed because his confession was not voluntary. Defendant specifically claims that he "was cajoled and harassed by the officers into making statements that were not voluntary." Defendant also alleges that the detectives "put words in his mouth on occasion," and "bamboozled [him]' into speaking against his interest." We are not persuaded by defendant's arguments, and find sufficient evidence on the record to support the trial court's finding that defendant's confession was voluntary.

A trial court's ruling on the voluntariness of a defendant's statement is fully reviewable on appeal. *State v. Kemmerlin*, 356 N.C. 446, 457-58, 573 S.E.2d 870, 880-81 (2002). Upon review, the Court looks to the totality of the circumstances in determining whether or not the defendant's statement was voluntary. *Id.* Some of the factors the Court considers are

"whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant."

*State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000) (quoting *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994)). "The presence or absence of any one of these factors is not determinative." *Kemmerlin*, 356 N.C. at 458, 573 S.E.2d at 881. Applying these principles to the facts in the record, we find no error in the trial court's conclusion.

Although defendant claims that the officers harassed and tricked him into making statements against his interest, defendant never points to the specific evidence upon which these accusations are based. After reviewing the record, there does not appear to be any evidence that defendant was verbally or physically threatened, nor does there appear to be any evidence that the officers used promises to induce a confession. Additionally, there is no indication that the interrogation was unduly long, nor is there any suggestion that defendant was deprived of basic comforts and necessities.

Although the record does contain some evidence documenting defendant's limited mental capacity, the evidence does not indicate that defendant was unaware of his legal situation, or the potential ramifications of his statements. Rather, the evidence shows that defendant was read his *Miranda* rights, that he understood them, and that he made a conscious decision to waive those rights. In light of the foregoing facts, the totality of the circumstances support the trial court's ruling that defendant's confession was voluntary.

### III. Sixth Amendment Right to Counsel

[4] Defendant's second argument on appeal is that the trial court violated his Sixth Amendment rights by denying him counsel at trial. Specifically, defendant argues that it was structural error to force him to proceed without counsel because his mental competence placed him in the "gray-area." "Gray-area" defendants are those who are " 'competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam)] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves'[.]" *State v.*

*Lane,* 362 N.C. 667, 668, 669 S.E.2d 321, 322 (2008) (quoting *Indiana v. Edwards,* 554 U.S. 164, 178, 171 L. Ed. 2d 345, 357 (2008)) (alteration in original), *cert. denied,* ___ U.S. ___, 181 L. Ed. 2d 529 (2011). In essence, defendant's argument is that the Sixth Amendment prohibits a court from forcing a defendant to proceed without counsel if that defendant's competence places him in the "gray-area." We disagree.

" 'It is well settled that de novo review is ordinarily appropriate in cases where constitutional rights are implicated.' " *State v. Wray,* 206 N.C. App. 354, 356, 698 S.E.2d 137, 140 (2010) (quoting *Piedmont Triad Reg'l Water Auth. V. Sumner Hills, Inc.,* 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001)).

> The right to counsel is guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I of the North Carolina Constitution. A part of this right includes the right of an indigent defendant to appointed counsel. N.C. Gen. Stat. § 7A–450 [(2007)].

*State v. Montgomery,* 138 N.C. App. 521, 524, 530 S.E.2d 66, 68 (2000) (citations omitted). However, this right is not absolute. Through his own actions, a defendant may lose his right to counsel. *Wray,* 206 N.C. App. at 357, 698 S.E.2d at 140. The loss of one's right to counsel is known as a forfeiture, which "results when the state's interest in maintaining an orderly trial schedule and the defendant's negligence, indifference, or possibly purposeful delaying tactic, combine[] to justify a forfeiture of defendant's right to counsel." *Montgomery,* 138 N.C. App. at 524, 530 S.E.2d at 69 (alteration in original) (internal quotation marks and citation omitted). "Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *Montgomery,* 138 N.C. App. at 524, 530 S.E.2d at 69 (internal quotation marks and citation omitted).

The United States Supreme Court "has generally applied a presumption against the casual forfeiture of U.S. Constitutional rights." *Wray,* 206 N.C. App. at 359, 698 S.E.2d at 141. Although the court has never directly ruled on the issue of forfeiture of the right to counsel, the general consensus among federal and state courts is that it does not violate the Sixth Amendment if it is in response to "instances of severe misconduct." *See id.* However, a unique situation arises when issues of mental competency accompany the forfeiture of the right to

counsel. Defendant's basic assertion is that the Sixth Amendment right to counsel applies with greater force to a "gray-area" defendant than it does to a defendant who is merely indigent. Thus, although a "gray-area" defendant may commit serious misconduct that would ordinarily justify forfeiture, defendant argues that it would violate the Sixth Amendment to deprive this "gray-area" defendant of his right to counsel.

On the issue of mental competency, it is well established that the United States Constitution does not permit the trial of an individual who lacks mental competency. *See Godinez v. Moran*, 509 U.S. 389, 396, 125 L. Ed. 2d 321, 330 (1993). The competency standard for standing trial is often referred to as the *Dusky* standard, which analyzes "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and a 'rational as well as factual understanding of the proceedings against him.' " *Id.* By definition, a "gray-area" defendant satisfies the *Dusky* standard for mental competence. However, it is debatable whether a "gray-area" defendant is truly competent to represent himself at trial.

Although standing trial while represented by counsel is an entirely different concept than conducting one's own defense at trial, the Supreme Court has expressly refused to adopt a higher standard of competency for self-representation than the basic *Dusky* standard. In *Godinez*, the Court "reject[ed] the notion that competence to . . . waive the right to counsel must be measured by a standard that is higher than (or different from) the *Dusky* standard." 509 U.S. at 398, 125 L. Ed. 2d at 331. Although the *Godinez* decision involved the competency to waive representation rather than the competency to represent oneself at trial, the latter issue was directly confronted by the Supreme Court in *Indiana v. Edwards*, 554 U.S. 164, 171 L. Ed. 2d 345.

In *Indiana v. Edwards*, the Supreme Court held that it does not violate the constitution if a state refuses to allow a "gray-area" defendant to conduct his own defense at trial. *Id.* at 177-78, 171 L. Ed. 2d at 357. Although the court acknowledged that the *Dusky* standard alone is probably insufficient for determining a defendant's competency to represent himself at trial, it ultimately refused to endorse a federal constitutional standard different than the *Dusky* standard for determining whether a defendant is competent to proceed to trial without counsel. *Id.* at 178, 171 L. Ed. 2d 357. Rather, the court held that a

state is free to adopt higher competency standards for *pro se* defendants than the *Dusky* standard, but the constitution does not require such action. *Id.*

In the present case, there is sufficient evidence that the defendant was competent to stand trial. Although defendant had a low IQ and a history of mental illness, several formal evaluations diagnosed him as malingering. Even if defendant could successfully argue that his diminished mental capacity places him in the "gray-area," *Indiana v. Edwards* and *Godinez* make it clear that the constitution does not prohibit the self-representation of a "gray-area" defendant. Although self-representation resulting from forfeiture is not the same concept as self-representation due to voluntary waiver, the Supreme Court has expressly refused to adopt a higher competency standard for self-representation in general. *See Indiana v. Edwards*, 554 U.S. at 178, 171 L. Ed. 2d at 357; *Godinez*, 509 U.S. at 398, 125 L. Ed. 2d at 331. Thus, defendant's argument that it violates the Sixth Amendment to force a "gray-area" defendant to represent himself at trial is not supported by Supreme Court precedent.

## IV.  Forfeiture of the Right to Counsel

[5]  Defendant's next argument on appeal is that the trial court committed structural error in ruling that defendant forfeited his right to counsel. Defendant's main argument is twofold. First, defendant contends that his conduct was not the type of serious misconduct that would justify a ruling of forfeiture. Second, defendant argues that he could not have forfeited his right to counsel because his competence placed him in the "gray-area," and North Carolina common law prohibits a "gray-area" defendant from representing himself at trial. Finally, defendant contends that the court's forfeiture ruling should be reversed on the grounds that the facts in the present case are closely analogous to the facts in *Wray*, 206 N.C. App. 354, 698 S.E.2d 137. We find none of these arguments persuasive.

### A.  Serious Misconduct

Defendant's first argument is that he never committed the type of serious misconduct that would justify a ruling of forfeiture. Specifically, defendant contends that "[t]he cases where forfeiture was upheld involved situations where the defendant was misbehaving in open court." Because defendant never egregiously misbehaved in open court, defendant argues that his conduct does not fit the category of severe misconduct that would support a ruling of forfeiture.

We disagree with defendant's mischaracterization of the case law concerning forfeiture, and affirm the trial court's ruling that defendant committed serious misconduct that would support a ruling of forfeiture.

First, we reject defendant's argument that the cases upholding forfeiture only involve situations where defendant misbehaved in open court. This argument completely ignores a bevy of cases where defendant's out-of-court conduct resulted in a ruling that defendant forfeited his right to counsel. *See e.g.*, *United States v. McLeod*, 53 F.3d 322, 325–26 (11th Cir. Ala. 1995) (defendant forfeited his right to counsel where he was abusive toward his attorney and threatened to harm him); *State v. Boyd*, 205 N.C. App. 450, 452, 697 S.E.2d 392, 394 (2010) (defendant forfeited his right to counsel by refusing to cooperate with his appointed attorneys and.by adamantly insisting that his case would not be tried); *State v. Quick*, 179 N.C. App. 647, 650, 634 S.E.2d 915, 918 (2006) (defendant forfeited his rights to counsel because his failure to retain counsel over an eight-month period amounted to an obstruction and delay of the proceedings). Although forfeiture may occur as a result of egregious courtroom misbehavior, the focus is not on where the misbehavior occurred, but on the nature and effect of the misbehavior itself. "The general consensus has been that 'an accused may forfeit his right to counsel by a course of serious misconduct towards counsel that illustrates that lesser measures to control defendant are insufficient to protect counsel and appointment of successor counsel is futile. . . .' " *Wray*, 206 N.C. App. at 360, 698 S.E.2d at 142 (quoting *King v. Superior Court*, 132 Cal. Rptr. 2d 585, 588 (Cal. 3d Dist. Ct. App. 2003)). "Any willful actions on the part of the defendant that result in the absence of defense counsel constitutes a forfeiture of the right to counsel." *Quick*, 179 N.C. App. at 649–50, 634 S.E.2d at 917. " '[A] defendant who is abusive toward his attorney may forfeit his right to counsel.' " *Montgomery*, 138 N.C. App. at 525, 530 S.E.2d at 69 (quoting *McLeod*, 53 F.3d at 325 (holding defendant forfeited his rights to counsel after he was "repeatedly abusive, threatening, and coercive" toward his court-appointed counsels)).

In the present case, defendant was appointed counsel on three separate occasions. Each counsel moved to withdraw as a direct result of defendant's behavior. When revisiting his ruling that defendant forfeited his right to counsel, Judge Levinson was careful to point out that defendant's misconduct was "not just being uncooperative or merely noncomplian[t]," "it ha[d] gone beyond that." Judge Levinson specifically recounted that defendant had engaged in serious miscon-

duct by physically and verbally threatening several of his attorneys, and by threatening to bring a frivolous claim to the State Bar against his third attorney. In addition to these acts of misconduct, the testimony at the forfeiture hearing revealed that defendant consistently shouted at his attorneys, insulted and abused his attorneys and at one point spat on his attorney and threatened to kill him.

Defendant, a diagnosed malingerer, not only engaged in dilatory tactics by refusing to cooperate with his court- appointed counsels, but he consistently engaged in abusive conduct toward all three of his counsels. In light of the aforementioned evidence of defendant's serious misconduct, Judge Levinson did not err in finding that defendant committed serious misconduct that would justify a ruling that he forfeited his right to court-appointed counsel.

### B.  Forfeiture of "Gray-Area" Defendant's Right to Counsel

Defendant's next argument is that the trial court erred in ruling that he forfeited his right to court-appointed counsel, because defendant was in the "gray-area" of mental competence. Beyond arguing that the Sixth Amendment prohibits the forfeiture of a "gray-area" defendant's right to counsel, defendant additionally contends that such a result is prohibited by North Carolina common law. Defendant specifically argues that North Carolina law prohibits trying a "gray-area" defendant who is not represented by counsel. Thus, according to defendant, under North Carolina law, a "gray-area" defendant could never forfeit his right to counsel.

Defendant bases his legal argument on the North Carolina Supreme Court's holding in *Lane*, 362 N.C. 667, 669 S.E.2d 321, and the North Carolina Court of Appeals' holding in *Wray*, 206 N.C. App. 354, 698 S.E.2d 137. Both of these cases were decided in the wake of the United States Supreme Court's holding in *Indiana v. Edwards*, 554 U.S. 164, 171 L. Ed. 2d 345, and both cases sought to clarify North Carolina law in regard to self-representation by "gray-area" defendants.

In *Lane*, the North Carolina Supreme Court analyzed the significance of *Indiana v. Edwards* in relation to a "gray-area" defendant's voluntary waiver of his right to counsel. The defendant in *Lane* was a potential "gray-area" defendant who waived his right to counsel and was ultimately found guilty of first-degree murder. *Lane*, 362 N.C. 667, 669 S.E.2d 321. The defendant argued on appeal that he was entitled to a new trial because the trial court was unaware that the recent decision in *Indiana v. Edwards* afforded state courts the discre-

tionary power to deny a "gray-area" defendant's request to represent himself. *Id.* at 668, 669 S.E.2d at 322. The North Carolina Supreme Court remanded the case to the superior court to determine: (1) whether the defendant was "borderline-competent" at the time that he sought to represent himself; and (2) if the defendant was found to be "borderline-competent," would the trial court, in its discretion, have precluded self-representation for the defendant? *Id.*

*Lane* stands for the proposition that a North Carolina trial judge may prohibit a defendant from waiving his right to counsel if "a realistic account of the particular defendant's mental capacities" indicates that he would not be competent to conduct trial proceedings without the assistance of counsel. *Lane*, 362 N.C. at 668, 669 S.E.2d at 322. However, *Lane* stops short of holding that a trial judge may never permit a "gray-area" defendant to represent himself at trial. In other words, *Lane* fails to indicate whether North Carolina has elected to adopt a higher competency standard that absolutely prohibits a "gray-area" defendant from representing himself at trial. *See Indiana v. Edwards*, 554 U.S. at 178, 171 L. Ed. 2d at 357. This ambiguity is further highlighted by this Court's holding in *Wray*, 206 N.C. App. 354, 698 S.E.2d 137.

In *Wray*, a potential "gray-area" defendant specifically argued on appeal, "that the trial court erred by ruling that he had 'forfeited' his right to representation by counsel, on the grounds that there was evidence that Defendant was not competent to represent himself." *Wray*, 206 N.C. App. at 357, 698 S.E.2d at 140. The Court announced that it agreed with the defendant's argument and ultimately reversed the trial court's forfeiture ruling. *Id.* However, the Court's reversal was not exclusively based on the evidence that the defendant may have been in the "gray-area" of mental competence. *Id.* at 371, 698 S.E.2d at 148. Rather, the *Wray* Court cited four distinct reasons why the trial court erred in ruling that the defendant forfeited his right to counsel. *Id.* Thus, although the defendant's borderline incompetence was among those reasons, it cannot be said with any certainty that the evidence of the defendant's potential incompetence could have been sufficient on its own to support the Court's reversal.

Although the holdings of *Lane* and *Wray* indicate that North Carolina courts strongly disfavor self-representation by "gray-area" defendants, neither case explicitly forbids it. In the case *sub judice* defendant was found to be malingering and found to be competent, findings which we have upheld. Due to his own misconduct, it cannot be determined if defendant is even in the "gray-area."

**STATE v. CURETON**

[223 N.C. App. 274 (2012)]

Defendant seeks to rely on this Court's opinion in *Wray*, 206 N.C. App. 354, 698 S.E.2d 137. In *Wray*, the Court cited its reasons for reversing the trial court's forfeiture ruling as follows: (1) there was significant evidence that the defendant may be a person whose competence is in the "gray-area"; (2) the record did not establish that the defendant engaged in the kind of serious misconduct associated with forfeiture of the right to counsel; (3) the evidence of the defendant's misbehavior was the same evidence that cast doubt on his competence; and (4) the defendant was not given an opportunity to participate at his forfeiture hearing. *Wray*, 306 N.C. App. at 362, 698 S.E.2d at 143. Defendant argues that the present case is analogous to *Wray*.

By threatening his attorneys, writing insulting letters and spitting in the face of Sanders, defendant engaged in serious misconduct. This stands in stark contrast to the defendant in *Wray* whose primary misconduct was that he was "disagreeable, suspicious, and obsessed with legally irrelevant matters pertaining to his incarceration." *Wray*, 206 N.C. App. at 368, 698 S.E.2d at 146.

Turning to defendant's assertion that the evidence of his misbehavior was the same evidence that showed his incompetence, we find this argument unpersuasive. In *Wray*, as evidence of incompetence, the Court noted that the defendant "appeared not to grasp his legal situation and was unable to focus on pertinent legal issues." *Id.* Because the evidence of the defendant's misbehavior was his " 'apparent obsession' with irrelevancies, rather than abusive or disruptive actions," the Court concluded that this evidence was directly pertinent to the issue of defendant's competence. *Id.* In contrast, in the present case, the evidence of defendant's incompetence is rather distinct from the evidence of defendant's misbehavior. As evidence that defendant was incompetent to represent himself at trial, defense counsel focuses on defendant's alleged inability to understand what was going on at trial. In other words, defense counsel claims that defendant's substandard intelligence rendered him incompetent to represent himself at trial. When examining the evidence of defendant's misbehavior, this evidence does not point to defendant's inability to comprehend court proceedings. Rather, the evidence of defendant's misbehavior points to defendant's difficulties with controlling his anger and aggression. Defendant never argues that his aggressive tendencies rendered him incompetent to represent himself at trial. Furthermore, the trial transcript reveals an absence of this type of misbehavior while defendant was conducting his own defense at trial.

Finally, turning to defendant's argument that he was in the "gray-area," although there is some evidence that casts doubt on defendant's competency to represent himself at trial, there is a substantial amount of evidence that indicates defendant was not in the "gray-area" of mental competence. As mentioned earlier, the *Wray* Court considered the defendant's apparent inability to grasp his legal situation and focus on pertinent legal issues compelling evidence that the defendant was incapable of effectively representing himself. *Id.* at 368, 698 S.E.2d at 146. Additionally, the Court took special note of the trial judge's statement at trial: "it is obvious to me that Mr. Wray is incapable of representing himself effectively." *Id.* at 365, 698 S.E.2d at 145.

In the present case, defendant's argument that he was in the "gray-area" revolves almost exclusively around the evidence of his low IQ, his past psychological evaluations, and his history of mental illness. The persuasiveness of these past records is seriously undermined by Dr. Vance's more recent diagnosis that defendant was malingering. Furthermore, the trial transcript itself provides substantial evidence that defendant was sufficiently competent when he represented himself at trial. Analyzing the problem of "gray-area" defendants going to trial without counsel, the United States Supreme Court explained in *Indiana v. Edwards*:

> Mental illness . . . interferes with an individual's functioning at different times in different ways. [A]n individual . . . will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

554 U.S. at 175-76, 171 L. Ed. 2d at 356. The Court described these tasks "as including organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury." *Id.* at 176, 171 L. Ed. 2d at 356. After reviewing the trial transcript, it is evident that defendant was able to carry out the basic tasks needed to present his own defense. Defendant participated in *voir dire*, he argued points of law, he cross-examined witnesses, he introduced evidence and he made a closing statement to the jury in which he summarized the facts in a manner that helped create a reasonable doubt as to his guilt. In contrast to the defendant in *Wray*, defendant's trial participation provides strong evidence that he was able to understand, and focus on pertinent legal issues. Accordingly, we hold that the trial court did not err in ruling that defendant forfeited his right to court-appointed counsel.

## V.  Conclusion

We hold that the trial court did not err in denying defendant's motion to suppress the statements defendant made during the police interrogation. The State presented sufficient evidence to show that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Furthermore, the State presented sufficient evidence that a reasonably objective officer would not have believed defendant invoked his right to counsel. Finally, the State presented sufficient evidence to show that defendant's confession was voluntarily made.

We hold that the State did not violate defendant's Sixth Amendment right to counsel by forcing defendant to proceed at trial without counsel.

We hold that the trial court did not err in ruling that defendant forfeited his right to court-appointed counsel. The State presented sufficient evidence that defendant committed the type of serious misconduct that would justify a ruling of forfeiture. Finally, the record contains significant evidence to rebut defendant's contention that the present case is analogous to the facts in *Wray*. Accordingly, we hold defendant received a fair trial free of prejudicial error.

No prejudicial error.

Judges CALABRIA and STROUD concur.